IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLLE
Assigned on Briefs June 23, 2015

**STATE OF TENNESSEE v. JUAN VILLA**

**Appeal from the Criminal Court for Bradley County**
**No. 12-CR-425B    Amy Reedy, Judge**

—————————————

**No.  E2014-01990-CCA-R3-CD – Filed October 8, 2015**

—————————————

The Defendant, Juan Villa, was found guilty by a Bradley County Criminal Court jury of aggravated child abuse, a Class A felony.  *See* T.C.A. § 39-15-402 (2014).  The trial court sentenced the Defendant to twenty-three years' confinement at 100% service as a violent offender.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by denying his motion for a mistrial, and (3) his sentence is excessive.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Andrew J. Brown (on appeal) and Carl F. Petty (at trial), Cleveland, Tennessee, for the appellant, Juan Villa.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Robert Stephen Bebb, District Attorney General; and Cynthia Lecroy-Schemel, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In this case, the Defendant and the codefendant, Lindsey Lewis, were indicted for aggravated child abuse as a result of multiple bone fractures sustained by their infant son. The victim was less than two months old at the time the injuries were discovered.

At the trial, Cleveland Police Detective Andy Wattenbarger testified that on July 6, 2012, he drove to a hospital to investigate a child abuse allegation.  He spoke to a physician in the emergency room, reviewed the victim's x-rays, and spoke to the Defendant and the codefendant.    After   speaking   with   the   Defendant   and   the   codefendant,   Detective

Wattenbarger learned that on June 10, the Defendant fell against a coffee table while he was holding the victim. The detective learned that the incident occurred around midnight and that the codefendant took the victim to the hospital around 6:00 p.m. the following day. The detective said that on June 21, between 7:30 and 8:30 a.m., the Defendant fell while walking up stairs and holding the victim, that paramedics responded to the home, and that the codefendant and the victim were taken to the hospital by an ambulance. The victim's medical records were received as exhibits.

The medical records relative to June 10, 2012, reflect that the codefendant told medical personnel that the Defendant fell while holding the victim at 9:00 a.m., that the victim hit his head on a coffee table, and that later in the afternoon the codefendant found blood in the victim's left ear. The records reflect that the victim was treated at the hospital at 7:37 p.m. Relative to June 21, the records reflect that at 8:10 a.m., the codefendant was holding the victim when the paramedics arrived at the home, that she stated the Defendant fell down seven to ten stairs while holding the victim, that the victim appeared lethargic initially and had irregular breathing, that the victim had a bruise on the right side of his forehead, and that the victim was moving all of his extremities and could open his eyes. Relative to July 6, the records reflect that the victim was taken to a children's hospital, that the victim underwent a bone scan while being treated in the emergency room, that the results of the scan showed a left parietal skull fracture, healing fractures to the tenth and eleventh left ribs, a healing fracture to the left anterior fifth rib, "metaphyseal" corner fracture to the right femur, a displaced complete fracture to the left femur, incomplete fractures to the right tibia and fibula, new bone formation on the right fibula, a healing fracture to the left proximal tibial metaphysic, and a healing metaphyseal fracture to the left humerus, for a total of sixteen bone fractures. The records reflect the codefendant advised medical personnel that the victim was usually fussy, that she did not know how the fractures were inflicted, and that the victim was "never out of her sight."

Detective Wattenbarger testified that the victim lived with the Defendant and the codefendant. Detective Wattenbarger identified photographs of the victim taken at the children's hospital on July 6, which showed that the victim had a swollen left leg and thigh, bruises on the left side of the head, small cuts to the left ear, a scrape on the left nostril, and hemorrhaging in the right eye.

Detective Wattenbarger testified that on July 10, 2012, four days after the victim was admitted to the children's hospital, he visited the Defendant and the codefendant's home. He looked for evidence of any type of fall and for the locations of the coffee table and an area rug. He took photographs, which showed the entrance, living room, coffee table, and stairs. The area rug that had been under the coffee table had been rolled and placed outside on the

front walkway. The detective said that he spoke to the codefendant's mother, Leisa Jarocki, who reported caring for the victim on July 1 and July 2. The detective said that he excluded Ms. Jarocki as the person who inflicted the victim's injuries. He said that the Defendant and the codefendant cared for the victim at all other times between the victim's birth and the victim's admission to the children's hospital on July 6.

On cross-examination, Detective Wattenbarger testified relative to the June 10 incident that the victim was taken to the hospital and that medical personnel did not contact the police about the victim's injuries. Relative to the June 21 incident, Detective Wattenbarger said the CT scans and x-rays showed "everything was okay." He agreed that on June 26, the Defendant and the codefendant discovered the victim's swollen leg, that they took the victim to Cleveland Pediatrics as they were advised to do, that the victim was seen by Dr. Felicito Fernando, who referred the victim to Dr. Gary Voytik, and that Dr. Fernando did not contact the police regarding the injury. The detective agreed that Dr. Voytik did not contact the police after treating the victim. The detective agreed that the victim was treated four or five times by licensed physicians at the Defendant and the codefendant's request. He did not find evidence that the Defendant and the codefendant disregarded any medical advice provided by the physicians.

Detective Wattenbarger testified relative to July 6, the physicians treating the victim at the children's hospital obtained the June 10 and 26 x-rays from the previous hospital. The detective agreed the rug he saw outside the Defendant and the codefendant's home on July 10 was the rug over which the Defendant said he had tripped, causing the victim to hit his head on the coffee table. The detective was told that the rug was removed because it was a hazard. He agreed that the Defendant and the codefendant were interviewed separately and that they provided consistent statements on the "major points." The detective agreed they both stated that while the codefendant was in the shower, the Defendant fell down the stairs while holding the victim and that the Defendant yelled for the codefendant. The detective agreed that usually suspects' statements were inconsistent. He agreed that the Defendant and codefendant did not implicate each other and that no evidence showed the Defendant and codefendant were abusive toward each other between June 10 and July 6.

Detective Wattenbarger testified that on July 6, the victim was first taken to the pediatrician's office because of a fever and that the pediatrician had an ambulance transport the victim to the children's hospital. The detective's investigation showed that the codefendant was the victim's primary caregiver during the day while the Defendant worked. Detective Wattenbarger said the only information he had relative to when the injuries occurred was the victim's medical records.

Detective Wattenbarger testified that when he arrived at the hospital on July 6, the codefendant, her mother, and her sister were present. He said that based on his interaction with the Defendant at the police station on July 6, he concluded that the Defendant was not abusing drugs. He agreed the codefendant was home but not present when the Defendant fell while holding the victim on June 10 and 21. The detective learned that two additional children lived in the family home and that the children's ages were five years and less than one year. He agreed the codefendant mentioned that the child who was less than one year old had crawled on the victim.

Detective Wattenbarger testified that the codefendant took the victim to the victim's two-week-old wellness visit on May 20, that no skull fracture was noted in the victim's June 10 medical records, and that the codefendant took the victim for his one-month wellness visit on June 15. Relative to June 21, the detective agreed that the codefendant was asleep upstairs when the Defendant fell down the stairs while holding the victim and that the codefendant awoke to the Defendant's yelling. The codefendant reported seeing the victim and the Defendant lying on the floor and said she called 9-1-1. The detective agreed that at the hospital, the x-rays and CT scans of the victim's skull, spine, and chest were negative, that the victim was treated by numerous physicians, and that the victim was released to go home. The detective agreed that later the same night, the Defendant and the codefendant saw the victim's swollen left leg, that they contacted the hospital, and that they were advised by hospital personnel to take the victim to the pediatrician's follow-up appointment scheduled for the next day. Detective Wattenbarger agreed Dr. Fernando treated the victim at the pediatrician's follow-up visit on June 22 and did not report any suspicions of child abuse, although an x-ray showed a fractured tibia. Dr. Fernando referred the victim to Dr. Voytik for the fractured tibia.

Detective Wattenbarger testified that on June 26, Dr. Voytik treated the victim and concluded that the victim had a "questionable" leg fracture. Detective Wattenbarger agreed that in child abuse cases, parents often delayed obtaining medical attention. He agreed that on June 21, the physicians and nurses at the hospital did not notice a swollen left leg and that it was appropriate for the codefendant to obtain medical treatment for the victim.

Detective Wattenbarger testified that the Defendant and the codefendant's home was clean and maintained. He agreed the photographs of the home showed that the victim's bassinet was beside the Defendant and the codefendant's bed, that only one hand rail was installed at the stairs, and that the stairs were "open to the living room" without a rail. The detective did not obtain measurements of the stairs or the distances between the tenth step and the landing.

On redirect examination, Detective Wattenbarger testified that he scheduled an appointment to visit the Defendant and the codefendant's home. The detective stated that he was unable to find any medical records reflecting that the Defendant was injured during his falls while holding the victim. He agreed the medical records showed the codefendant stated that she did not know "how any of that happened, he is never out of my sight" and that the victim was "usually a fussy baby." On recross-examination, Detective Wattenbarger stated that he was not present when the codefendant made the statements and that he could not speak to their accuracy. He agreed he only visited the Defendant and the codefendant's home once.

Leisa Jarocki, the codefendant's mother, testified that she provided the police with photographs of the victim. She identified the photographs, which depicted the victim at the hospital on the day of his birth and two days after his birth at the Defendant and the victim's home. Ms. Jarocki identified a bruise on the victim's left cheek in the photographs taken two days after the victim was born. She identified photographs of the victim taken on July 9 and July 11, while the victim was being treated at the children's hospital. The photograph taken on July 11 showed splints on the victim's left arm and both legs and a feeding tube inserted into the victim's nose.

On cross-examination Ms. Jarocki testified that during the month of June, she saw the victim after the Defendant fell down the stairs while holding the victim because the codefendant asked Ms. Jarocki to examine the victim after the victim was released from the hospital. Ms. Jarocki noted that she had been a nurse for twenty years and that most of her work involved pediatrics. She said the victim was fussy but was okay. She denied noticing anything wrong with the victim during the month of June. She never saw the Defendant or the codefendant abuse any of their children and said they were good parents. She said that the Defendant worked hard and provided for his family and that she never suspected him of abusing any of the children. She said the codefendant would have never allowed anyone to harm her children.

Ms. Jarocki testified that she accompanied the codefendant and the victim to the victim's one-month wellness visit and that the doctor said the victim was healthy. Ms. Jarocki said that she cared for the victim and the codefendant's daughter from a previous relationship for three days at the end of June because the Defendant's young daughter from a previous relationship was hospitalized for "strep[]." Ms. Jarocki stayed at the Defendant and the victim's home during that time and said the home was in typical condition for a household with three children. She denied the home was dirty. She said that during the three days she cared for the children, the victim was a little fussy like any baby the same age and that the victim cried when he was hungry, needed a clean diaper, or was uncomfortable. She

had no concerns about the victim's welfare. On redirect examination, Ms. Jarocki testified that she had never seen the codefendant's daughter from a previous relationship hold the victim inappropriately, hit the victim, or shake the victim.

Jacqueline Lewis, the codefendant's sister, identified a photograph she took of the Defendant holding the victim with one hand away from the Defendant's body. She said that at the time the photograph was taken, the Defendant was swaddling the victim before putting the victim to bed, that the victim looked "cute," that she asked to take the victim's photograph, and that the Defendant held up the victim. She was unsure whether the codefendant was present for the photograph but knew the codefendant was home. She thought the photograph was taken between June 10 and June 21, before the fall down the stairs and when the victim was about one month old.

On cross-examination, Ms. Lewis testified that she had never seen the Defendant mistreat any of the children and that the Defendant did not do anything to place the children purposefully in danger. She said she did not have any concern about the manner in which the Defendant was holding the victim in the photograph. She said the victim did not appear to be hurt.

Ms. Lewis testified that she drove the codefendant and the victim twice to the pediatrician's office, that she visited the Defendant and the codefendant's home once per week, and that she sometimes stayed overnight. Ms. Lewis said she had no concerns about the manner in which the codefendant and the children interacted. She said the Defendant and the codefendant fed the victim, changed the victim's diapers, and cared for the children like normal parents.

Dr. Felicito Fernando, a board certified pediatrician, testified that on May 30, 2012, the victim was seen by a nurse practitioner for a routine visit and that no concerns arose from the visit. He said "everything seemed to be appropriate" at the victim's one-month wellness visit on June 15, although there were concerns about thrush, nasal congestion, and the victim's circumcision. Dr. Fernando said his notes did not reflect the parents' mentioning the Defendant's falling while holding the victim. The victim returned one week later on June 22. At that visit, Dr. Fernando was told the Defendant had fallen down the stairs while holding the victim and that the victim was treated at the hospital. Dr. Fernando observed swelling in the victim's left leg, and the x-ray he ordered showed a "minimally displaced fracture" of the left tibial plateau. Dr. Fernando referred the victim to Dr. Voytik, an orthopedic specialist.

Dr. Fernando testified that he next saw the victim on July 6 and that the chief complaints were congestion since birth, decreased appetite, and fever. He said the victim had an abnormal appearance, was extremely irritable, and was failing to thrive. The victim had only gained eight grams per day during the previous two weeks, and Dr. Fernando noted that children of the same age gained between twenty-four to fifty grams per day. The victim also had bruises on his chin and left check, had hemorrhaging on the white area of his right eye, had a swollen and bruised ear, had an abrasion on his right nostril, and had dry and cracked lips. Dr. Fernando noted that only the congestion had been previously observed. The victim also was in respiratory distress and had a fast heartbeat. Dr. Fernando noted that the victim could move all of his exterminates but "arched," indicating the victim was experiencing pain. He said that he was concerned about the victim's failure to gain weight, the fever, and the bruising, which were inexplicable based on the history presented by the codefendant. He said, though, the codefendant explained that the victim's older sister was found sitting on the victim and pulling the victim's ear. Dr. Fernando did not believe the explanation was the cause of the victim's ailments. He said the Defendant did not attend any of the victim's appointments.

Dr. Fernando testified that the abrasions to the victim's ear and the eye hemorrhage were caused by trauma and that he was concerned about the victim's leg. The victim was admitted into the children's hospital to investigate the extent of the victim's injuries and to place him in protective custody. Dr. Fernando had significant concerns about physical abuse, although he could not observe any of the victim's fractures without an x-ray. He noted that infant bones were more pliable in order to prevent breaking during birth and said that the most common bone broken during delivery was the clavicle. He said any other broken bone on a child the victim's age was suspicious.

On cross-examination, Dr. Fernando testified that the tibia fracture was minimal and that the victim's fever was caused by trauma, not an infection. Dr. Fernando's notes from the July 6 visit in which the codefendant described finding the victim's older sister lying on the victim reflected that the codefendant's female friend was present at the appointment. Dr. Fernando recalled the hospital contacting him on June 10 regarding the victim and said his notes showed that the victim was injured during a fall by hitting the victim's head on a coffee table, that the victim had a one to two centimeter lesion, that the head CT was normal, and that the nurse practitioner "did not feel ill at ease" with the reported cause of the injury.

Dr. Fernando testified that he had not reviewed Dr. Voytik's report and that the report was not in his file. He said that between May 30 and June 22, he did not provide the codefendant with any restrictions about the victim's care or activity. He agreed he did not report any concerns of child abuse until July 6, when he had the victim admitted to the

children's hospital. He said he would have reported any suspected abuse if he had been convinced the victim had been abused.

Dr. Marla Sammer, an expert in pediatric radiology, testified that as bone fractures healed, calcium deposits called callus developed at the site of the fracture and that over time the fracture disappeared. She said that if no callus were seen at the site of a fracture, the fracture would have been less than fifteen days old. She said the classic bone fracture associated with child abuse was a metaphyseal bone fracture in which a portion of a bone was "sheared off" and usually resulted from violent shaking.

Dr. Sammer testified that she reviewed the victim's various x-rays and bone survey. She said that unlike adults, children had bone growth plates and that metaphyseal corner fractures occurred at the growth plates. She said that although infant bones were capable of bending, infant bones also fractured easily. She concluded that the June 10 CT scan showed a left non-healing mandible fracture but no skull fracture. She said the mandible fracture most likely occurred seven days before the June 10 x-rays. She said that the June 21 x-rays showed healing left rib fractures, which indicated that the fractures were sustained before June 21. The June 21 x-rays showed a new skull fracture on the left parietal bone, non-healing rib fractures, and a non-healing tibia fracture. She noted that the June 21 x-rays did not show a femur fracture but that the July 6 x-rays showed a healing femur fracture, which indicated the fracture was sustained after the June 21 x-rays but before the July 6 x-rays. She said the July 6 x-rays also showed a new non-healing right tibia fracture, indicating the fracture was less than ten days old. She said the July 6 x-rays also showed multiple fractures at the growth plate and a classic metaphyseal lesion, which were "highly specific for non-accidental trauma" and called corner fractures. She noted that the fractures were healing, that they occurred between seven and ten days before the July 6 x-rays, and that they were "suppose[d] to be from very . . . violent shaking." She said the victim also had a healing fracture on the left fibula.

Dr. Sammer testified that the skull fracture was not present on the June 10 x-rays but that the fracture was present on the June 21 x-rays and that the victim had soft-tissue swelling, hemorrhaging, and edema at the site of the fracture. She said that due to the soft-tissue swelling, the fracture was probably sustained on June 20 or 21. Relative to the rib fractures, she said that the June 21 x-rays showed that the fifth anterior rib was healing and that the victim had sustained recent and non-recent healing right rib fractures. She said the right rib fractures were probably sustained on June 20 or 21. She said that the July 6 x-rays showed lumbar and thoracic spine fractures, which were rare and usually caused by non-accidental trauma. She noted that these fractures and extremity fractures healed differently and said that she could not determine when the spinal fractures were sustained. She

concluded, though, that the fractures were caused by significant trauma. She said that she would not expect the victim to have sustained the bone fractures from a ten-month-old girl sitting on the victim.

Dr. Sammer testified that additional x-rays were taken on July 7, which showed metaphyseal corner fractures to the right and left wrists, and that the fractures were consistent with holding the victim by his wrists and shaking him. She said the fractures were sustained about seven to ten days before the x-rays. She stated that the victim's bone fractures took weeks and months to heal completely and that the fractures could not heal in a matter of days.

On cross-examination, Dr. Sammer testified that although determining the length of time it took for bone fractures to heal was difficult, physicians used the best data available based on the x-rays. She did not know if the victim underwent testing to determine if he had any type of bone disease. She said the non-healing right tibia fracture was consistent with blunt trauma and was probably sustained between June 26 and July 6. She said the mandible fracture was sustained as early as June 3. She said that although she considered ways in which the victim's bone fractures could have been sustained as a result of accidental trauma, the fractures were indicative of classic non-accidental trauma.

Dr. Sammer testified that all the fractures were sustained between approximately June 1 and July 7. She said that shaking was the most consistent explanation for most of the fractures, although some fractures looked as though they were caused by blunt force trauma. She agreed the skull fracture was consistent with striking the head against an object. She agreed numerous factors might affect the ability to date a bone fracture but said the series of x-rays narrowed the dates of infliction. She agreed corner fractures were difficult to identify and to date, and she said follow-up x-rays were usually obtained fourteen days after the initial x-rays to look for healing metaphyseal corner fractures.

Dr. Sammer testified that she did not examine the victim and that she did not receive any information about how the injuries might have occurred. She said that based solely on the x-rays, her opinion was the bone fractures were caused by non-accidental trauma. She agreed that a healing rate might have been affected by a person's overall health and that she did not determine the victim's overall health in making her conclusions.

Dr. Karla Garcia, a pediatrician and child abuse expert, testified that she was the director of the child protective team at the children's hospital. She said that corner fractures were small fractures at the end of long bones, including the wrist and elbow areas and at the end of the arm and leg bones. She said that casual bouncing, shaking, jostling, and tossing a

child in the air typical of most parents did not cause corner fractures and that corner fractures resulted from non-accidental trauma and physical abuse.

Dr. Garcia testified that she evaluated the victim on July 9, 2012, and that the victim had fifteen bone fractures, which were sustained between June 5 and July 6. She said that the victim and the parents underwent genetic testing to determine if the victim might have had a disorder to explain the bruising and fractured bones and that the results were negative. The victim also was negative for brittle bone disease, metabolic disorders, and organic diseases that could have explained the victim's condition. The victim also had normal bone mineral density. Dr. Garcia reviewed the victim's medical records, which stated that on June 10, the codefendant told medical personnel that while she was sleeping, the Defendant fell while holding the victim, that the victim struck his left cheek on the edge of a coffee table, and that the Defendant had never exerted force or abused any of the children. The records reflected that the victim had a bruise on his left cheek, a blood streak in his left ear canal, scabbing around his nose, and abdominal colic. The victim did not show indications of injuries to his extremities. The June 10 CT scan of the victim's head was negative for fractures.

Dr. Garcia testified that the June 21 medical records showed that the codefendant reported the Defendant fell down ten stairs while holding the victim, that the victim had bruises on the right forehead and behind both ears, and that swelling was visible behind the right ear. The victim, though, did not display indications of significant injury or tenderness to his extremities and had full range of joint motion. The June 21 chest x-ray and CT scan were negative, and the results were later used for comparison purposes in July. Relative to Dr. Fernando's June 22 records, Dr. Garcia said that the codefendant told Dr. Fernando the Defendant fell down the stairs while holding the victim, that the victim had a runny nose, nasal congestion, and a swollen left leg. The records noted that the congestion had worsened since June 15, and that the victim had moved from the tenth to the sixth percentile for body weight. The records reflect that the victim had thrush and that although the left leg was larger than the right leg, no redness, bruising, or tenderness was present. An x-ray showed a fracture to the left tibia.

Dr. Garcia testified that Dr. Fernando's July 6 medical records reflect that the victim had a fever and that the codefendant wanted the victim tested for "RSV" and "staph" because another child in the home had staph. Dr. Garcia noted the codefendant's stating that another child sat on the victim and pulled his ear. The codefendant reported that the victim had a loss of appetite, crankiness since birth, fever and chills, runny nose, and nasal congestion. The codefendant also reported a daytime cough and difficulty breathing the previous two days. The physical exam showed the victim had a small conjuntival hemorrhage that was not present at birth, a swollen left ear with a bruise, extreme nasal congestion, an abrasion on the

right nostril, dry lips and gums, and small bruises on the left cheek and left side of the chin. Dr. Fernando referred the victim to the children's hospital because of the victim's fever and because Dr. Fernando suspected that the injuries were non-accidental. The children's hospital emergency room records reflect similar information. Dr. Garcia noted that the eye hemorrhage and the injury to the ear were consistent with a "direct blow." X-rays and CT scans were obtained and compared with the previous results, and physicians confirmed skull, left tibial, and rib fractures. The codefendant told the physicians that she was not told about a skull fracture, that the leg fracture was treated by an orthopedic specialist, who said the tibia was normal, and that she denied any "injuries, shaking or falls." The emergency room records did not report any additional children in the family home, although Dr. Fernando's records showed other children were in the home.

Dr. Garcia testified that a fussy newborn could frustrate parents, that parents were instructed never to shake a newborn because it would result in severe injury or death, and that fussy newborns were at a higher risk for future physical abuse. Dr. Garcia noted sixteen fractures, which included fractures to the skull, mandible, right posterior tenth and eleventh ribs, left anterior fifth rib, right proximal humerus, right distal radius and ulna, left distal humerus, left distal radius and ulna, right proximal and distal femur, right proximal tibia, right fibula, left proximal femur, left distal femur, left proximal tibia, left proximal fibula, and third and twelfth vertebrae.

Dr. Garcia testified relative to the skull fracture that the MRI showed chronic hemorrhages and encephalomalacia, or scarring and deterioration of brain tissue, which was typically found in areas of trauma. Based on all of the medical records, she concluded four events occurred between June 5 and July 10. She noted seven corner fractures among all the bone fractures. She said that although the skull fracture was present on June 21, the original reading of the CT scan was negative for fractures. She noted that the mandible fracture was present on the June 6 CT scan but was not detected on the June 10 or 21 scans and that the radiologist dated the fracture before June 10. She said that the June 21 chest x-ray showed three rib fractures, although the original reading was negative for fractures. The June 21 x-rays were reevaluated by the radiologist on July 6. She noted that the June 22 x-rays only showed a left proximal tibia corner fracture, although the distal femur metaphyseal corner fracture and the left proximal femur metaphysis fracture were not present. She said the distal femur metaphyseal corner fracture and the left proximal femur metaphysis fracture were present on the July 6 x-rays, which meant that the fractures were sustained after June 22 but before July 6.

Dr. Garcia testified that in her opinion, the notable healing reflected in the July 6 x-rays indicated that the left distal radius and ulna fractures were sustained between June 26 and July 1. She said that five fractures were sustained after the Defendant fell twice while holding the victim and that two of those fractures were corner fractures. She noted that nothing in the medical records reflected that the victim suffered a "direct blow" after June 21 and that the fractures sustained after June 21 were not caused by blunt force trauma. She said that none of the victim's injuries could have been inflicted by a ten-month-old child's sitting on the victim. Dr. Garcia noted the significant swelling and bruising around the victim's ear on July 6 and said the injury was not normally associated with a pulling injury but was associated with direct blunt force trauma. She noted that although the Defendant's falling were explanations for the June 10 and June 21 injuries, no explanations were provided for the mandible fracture and the additional fractures present on July 6.

Dr. Garcia testified relative to the June 10 incident that the bruise on the victim's face was consistent with a fall. She said, though, that the mandible fracture occurred before June 10 because the June 10 CT scan showed a healing mandible fracture, although the physician who interpreted the scan on June 10 did not detect the fracture. Relative to the June 21 incident, she said that the skull fracture could have been caused by the Defendant's falling down the stairs while holding the victim. She noted, though, that posterior rib fractures rarely occurred from a fall. She conceded she did not know how the Defendant might have been holding the victim or if the victim fell out of the Defendant's hands. She said that the corner fractures she previously identified were not typically caused by a fall and that corner fractures were consistent with a shaking-type motion.

Dr. Garcia testified that the skull fracture would have caused swelling of the head and irritability. The mandible fracture would have impaired the ability to eat. The posterior rib fractures would have resulted in difficulty breathing and "splinting." She noted metaphyseal corner fractures presented no visible signs because these fractures were generally small. She said, though, the diaphysis fracture of the tibia was a large fracture and would have caused decreased movement and significant swelling. She noted the victim suffered pain from all the fractures. She said that the femur fracture caused the most developmental concern because the fracture might not heal properly, causing a bend to form in the bone or causing one leg to be longer than the other because of varying bone growth rates. She said the only course of treatment was to observe the leg growth over time. She noted the possible long term pain and functional disability associated with the fracture. She said that if one leg grew longer than another, playing sports and other physical activities might not be permitted. Relative to the brain injury and eye hemorrhaging, she said that some children recovered without any future issues and that other children developed significant health problems, including seizures, cerebral palsy, learning disabilities, and childhood developmental delays.

Dr. Garcia testified that based on her review of all the medical records, the histories provided for the two events, the sixteen bone fractures, the various rates of fracture healing, and the new fractures occurring before June 10 and after June 21, she concluded that the injuries were inconsistent with the reported falls, that the victim suffered non-accidental trauma, and that the victim had been physically abused.

On cross-examination, Dr. Garcia testified that the types of bone fractures the victim sustained were small and did not cause outside bruising. She agreed that although the victim might have been irritable and had minor swelling, a person without medical training would not have seen bruises or known the victim had bone fractures. She said the largest fractures were sustained to the tibia and femur. She agreed that on June 10, the trained medical personnel at the hospital did not note any fractures, although later review of the June 10 x-rays showed the victim had sustained the mandible fracture and possibly an anterior rib fracture before June 10. She said that the records showed scabbing around the victim's nose and agreed nasal scabbing was consistent with nasal discharge, which was noted throughout the victim's history since birth. She said the skull fracture could have been caused by falling down stairs. She agreed she could not determine who caused the fractures.

Dr. Garcia testified that healing rates varied based upon numerous variables, including the nutritional status of the child and whether the child was born prematurely, but that most fractures began healing within seven to ten days and most were not healed fully until six or more weeks. She agreed that relative to the fractures sustained by June 21, the fractures would have healed without medical intervention. She agreed that the victim's skull fracture was consistent with the Defendant's falling down stairs while holding the victim, causing the victim to hit his head on a wall or the floor. She also said that if those events occurred, the skull fracture would have been an accidental injury caused by blunt force trauma.

Dr. Garcia testified that generally, she discussed a child's medical history with the child's parents if they were available. She said, though, the victim's parents were not available because the Department of Children's Services (DCS) prevented the parents from having contact with the victim after his July 6 hospital admission.

Dr. Garcia testified that she first saw the victim on July 9. Relative to the victim's medical history, she said that at the victim's one-month wellness visit, the codefendant reported the victim's being fussy and having increased congestion. She said that on June 22, the codefendant reported to Dr. Fernando that the Defendant had fallen down stairs while holding the victim the previous day, that the victim had continued nasal congestion, and that the victim's left leg was swollen. Dr. Garcia said that on July 6, the codefendant reported to the children's hospital that the victim had decreased appetite, fever, congestion, irritability,

and difficulty breathing. She noted that congestion made it difficult for an infant to breathe and drink from a bottle simultaneously and that weight loss began after a couple days if the infant did not receive adequate nutrition. Relative to the victim's symptoms, she did not expect his condition to have affected the fracture healing rate because the fractures were recently sustained.

Dr. Garcia testified that shaken baby syndrome resulted in retinal hemorrhages of the eyes. She conceded that the victim did not have retinal hemorrhages and said that an optometrist confirmed that no blood was pooled behind the victim's eyes. She agreed the single subconjuntival hemorrhage to the outer portion of the victim's eye could have been caused by a fall, a scratch to the eye, or forceful coughing and vomiting.

Dr. Garcia testified that she examined the victim once or twice after July 9 and that she had not examined him since. She said each of the victim's injuries would have been inflicted within seconds. She noted medical literature did not discuss the duration of time necessary to inflict injuries similar to the victim's and said she did not think a long duration would have been required. She said that if an infant were slung by the infant's extremity and struck by a wall, the corner fractures might be caused by the slinging action, not by striking the wall. Dr. Garcia said her records did not reflect that the codefendant called the hospital after the victim was released on June 21 due to the codefendant's noticing the victim's swollen left leg. Dr. Garcia said that the initial test to determine whether the victim had brittle bones was inconclusive and that extensive tests were conducted over several weeks. Dr. Garcia said that the victim suffered no additional bone fractures after July 6.

On redirect examination, Dr. Garcia testified that the victim underwent physical therapy as a result of the fractures and that a January 2013 report from the physical therapist showed the victim was "developmentally delayed." Dr. Garcia had no further information about the victim's prognosis. On recross-examination, Dr. Garcia said factors other than excessive fussiness that might place an infant at risk for physical abuse included financial stress and a parental history of domestic abuse, alcohol abuse, substance abuse, or sexual abuse.

Dr. Gary Voytik testified on behalf of the Defendant that Dr. Fernando referred the victim to Dr. Voytik's orthopedic practice and that he treated the victim on June 26, 2012. Dr. Voytik concluded that the victim had lower limb and left knee pain and a questionable tibia fracture. Dr. Voytik said that the codefendant brought the victim to his office and that he would have told her that the victim had a questionable fracture. He explained pediatric bone fractures healed quickly. He said that he looked at the x-ray again and concluded that the tibia was fractured but would heal within one to six days. He provided this information

to the codefendant.  He did not apply a leg splint or wrap the victim's left leg and told the codefendant to bundle the victim in a blanket because the fracture would heal quickly.

On cross-examination, Dr. Voytik testified that bones in a five-week-old infant generally healed in five to seven days.  He said that although he treated children for orthopedic injuries, he did not treat many one-month-old infants for the type of injury the victim sustained.  He said, though, he probably treated a few similar injuries per year.  He agreed he only ordered an x-ray of the victim's left leg.

The Defendant testified that he was twenty-nine years old and that he had worked as a welder, plumber, carpenter, fabricator, and mechanic.  He said that he had been in a relationship with the codefendant for more than one year and that the victim was their son.  They lived together with his daughter from a previous relationship and the codefendant's daughter from a previous relationship.  He said he had custody of his daughter, who was ten months old at the time of the incident, until his arrest in the present case.  He said the codefendant's daughter was five years old at the time of the incident.  He said that the daughters shared a bedroom, that he and the codefendant shared a second bedroom, and the victim slept in a bassinet beside his and the codefendant's bed.

The Defendant testified that at the time of the incident, he was working about fifty hours per week at two part-time jobs and that he worked "quite a few" Saturdays.  He said that when he worked, the children stayed home with the codefendant, the primary caregiver.  He said the codefendant's mother cared for the children a couple of times.  He described the family home as hectic and said "it could add up to some stress."

The Defendant testified relative to the June 10 incident that he, the codefendant, the victim were downstairs and that he thought the two daughters were asleep upstairs.  He said that he had been sitting on the sofa, that he stood from the sofa while holding the victim, that he walked toward the stairs, and that he tripped on a rug, causing the victim to hit his head and chest on the side of the coffee table.  The Defendant noted that they had recently received the rug from a friend and that the ends of the rug were curved upward.  The Defendant did not hit his head on the coffee table, although he fell on the floor.  When asked if he dropped the victim, he said, "I had [the victim] and when I fell, I was falling forward, I hit knee first and his head caught the table and then I just rolled."  The Defendant got up from the floor and went upstairs to find the codefendant, who was taking a shower.  He said the codefendant examined the victim and made a doctor's appointment the following day.  The Defendant said the victim was not bleeding and seemed fine.  The Defendant said he fed the victim a bottle just before the fall occurred.  The Defendant said that he rolled the rug and threw it outside on the night of the incident.

The Defendant testified that he went to work on June 11 and received a text message from the codefendant that she was taking the victim to the pediatrician's office that day. He recalled that after he arrived home from work, he inquired about the appointment. He said that the victim only had a small bruise and that the victim seemed fine. He said that the family continued their daily routine until June 21. He said that on June 21, he awoke for work around 7:30 or 8:00 a.m., heard the victim crying, picked up the victim, walked downstairs, prepared a bottle, and began walking up the stairs. He said that he was holding the victim in one arm and the bottle in his opposite hand, that he reached the ninth or tenth stair, and that he tripped on his socks, which were loose and extended beyond his feet. He said, "I started falling forward and when I was trying to brace myself up I started falling backwards and when I started falling backwards I was trying to [move the victim] closer to my chest and as soon as I hit the stairs I had let go." He said it happened quickly. He said that after he landed on his back, he stood and saw the victim lying by the front door. The Defendant said he let go of the victim before the Defendant "hit the bottom of the stairs." He said the victim was crying. The Defendant said he screamed for the codefendant, who ran downstairs, and told her to grab her cell phone. The Defendant said he called 9-1-1 while the codefendant held the victim. He said the ambulance arrived within five minutes. The codefendant went to the hospital with the victim, and the Defendant stayed home with the two daughters. He said that the codefendant and the victim returned home from the hospital around 1:00 p.m. and that the victim was calm.

The Defendant testified that later that night, he noticed the victim's leg was swollen. He said that the codefendant called the hospital and that the codefendant was told to wait until the following day to talk to the victim's pediatrician. He said the victim appeared fine, except for the swollen leg. When asked about how the victim sustained the fifteen bone fractures, the Defendant said he did not know how the injuries could have occurred if the fractures were not caused by the two falls. He denied harming the victim. He said that he was at work when the codefendant and her sister took the victim to Dr. Fernando's office on July 6. The Defendant recalled the victim had a fever, thrush, and nasal congestion, which had been an ongoing concern. He said that the victim did not appear to be suffering from pain, was not irritable, and was not upset when the Defendant left for work on July 6. The Defendant recalled the victim was sleeping when he left for work.

The Defendant testified that he and Ms. Jarocki had a good relationship and that Ms. Jarocki came to his and the codefendant's home periodically. He said, though, he first learned when Ms. Jarocki testified the previous day that Ms. Jarocki went to their home to examine the victim after the fall. The Defendant said the codefendant did not mention anything to him about Ms. Jarocki's visit. He said that on July 6, the victim had been admitted to the children's hospital by the time he left work and that he went to the hospital

that evening. He said he learned of the incident in which his ten-month-old daughter was found on the victim and pulling the victim's ear when he left work that day. He said that when he was at the hospital that night, nobody asked him about the incidents involving the coffee table and the stairs. He said he returned home after a few hours, left the codefendant at the hospital, went to work on July 7, and returned to the hospital after work.

The Defendant testified that when he arrived at the hospital on July 7, the physicians had ordered several tests and that nobody at the hospital asked him any questions. He said the codefendant told him about the victim's bone fractures. He said that the codefendant asked if he had done anything to harm the victim and that he told the codefendant he had not hurt the victim. The Defendant said DCS contacted him on June 21 and that two caseworkers came to his home as a result of his falling while holding the victim. The Defendant told the DCS caseworkers how the falls occurred, and he said DCS did not attempt to obtain custody of the victim at that time. The Defendant said DCS did not have him charged with a crime or require him to take any tests. He said his next contact with DCS was at the children's hospital. The Defendant said he spoke to the DCS caseworker who came to his home on June 21. The Defendant said the DCS caseworker spoke to him and the codefendant about signing a waiver of rights form and asked the Defendant to submit to a drug screen. The Defendant complied and passed the drug screen. He denied abusing the victim and said he had never seen anyone abuse the victim.

The Defendant testified that he told Detective Wattenbarger about his tripping on the rug and falling down stairs while holding the victim. He denied ever being accused of abusing any of his children before this incident. He did not recall if he knew about the victim's swollen ear before the victim was seen by Dr. Fernando on July 6 but recalled the victim had nasal congestion for "quite awhile" by July 6. He recalled he and the codefendant began suctioning the victim's nose when the victim was three weeks old, which caused the victim's nose to develop little lacerations.

The Defendant said that during the relevant time period, the only people who had access to the victim other than himself and the codefendant were friends and family. He learned of the victim's bone fractures on July 6. The Defendant said that he saw a bruise on the victim's face after the victim struck the coffee table and that he saw a bruise on the back of the victim's head after the fall down the stairs. He said that between June 22 and July 5, he only knew of the victim's nasal congestion and generally "being sick." He denied failing to provide the victim food, clothes, shelter, or medical care. He denied hurting the victim.

On cross-examination, the Defendant testified that he was employed in the roofing industry at the relevant time period and that he almost fell off a roof once. He said that his ten-month-old daughter lived with him and the codefendant for about six months. He denied witnessing the codefendant's five-year-old daughter hurt the victim. He agreed that at the time of his July 6 interview with the detective, he had been laid off from his job. He said, though, that during the time the victim allegedly sustained his injuries, he worked at Rick's Plumbing. He agreed that at the relevant time period, he took prescribed oxycodone for scoliosis. He took thirty milligrams four times per day and said he knew he could not operate machinery or a vehicle while taking the medication. He said he had taken the medication when he tripped on the living-room rug but denied taking any medication when he fell down the stairs because he had just awoke to the victim's crying.

The Defendant testified that on June 10, when he tripped on the rug, the codefendant was taking a shower. He agreed that his July 6 statement said that the codefendant was asleep and that the Defendant held the victim all night. He denied lying and said he thought he told the police that the codefendant was taking a shower. He said, "I think I got it mixed up, I don't know if she was in the shower, I don't think she was." He denied that taking oxycodone prevented him from knowing what occurred and said that the medication did not have anything to do with it. He agreed that having three children under six years old in the house was difficult and that the codefendant sometimes tired of staying at home with three children.

The Defendant testified that the codefendant "got on to" him about the manner in which he played and interacted with the victim and that the codefendant thought he was too rough with the victim. He agreed that the codefendant told him when he played too rough with the children, including the victim, and that he swung the victim by his arms. He said he was about 5'10" and weighed 145 pounds at the time of the incidents. He agreed he told the police that he did not know if he hurt the victim by "playing with him, punching him in my face or get[ting] his legs and kick[ing] them." Relative to the photograph taken by the codefendant's sister showing the Defendant holding the victim with one hand away from the Defendant's body, the Defendant said that at the time, he did not think holding the victim in that manner was inappropriate but that he realized he should not have held the victim that way. He denied knowing the victim had bone fractures at the time the photograph was taken.

The Defendant testified that he did not recall telling the detective that he was at home when his ten-month-old daughter climbed on the victim, although he did not dispute the substance of his written police statement. He admitted he had taken oxycodone the day he spoke to the detective and said he took four doses that day. He agreed he fought with the

codefendant's father at the hospital when the victim was born and admitted he broke the codefendant's cell phone, although he denied almost breaking the codefendant's finger.

The Defendant testified that the only thing he knew that could have caused the victim's skull fracture was the fall down the stairs. He had no explanation for the cause of the victim's mandible, femur, tibia, fibula, radius, ulna, humerus, spine, and rib fractures. He was aware that the corner fractures were caused from shaking an infant. He agreed that he and the codefendant were the primary caregivers, that the codefendant cared for the victim the majority of the time, and that the victim did not attend daycare.

The Defendant testified that his ten-month-old daughter's mother had a substance abuse problem, that DCS contacted him about his daughter, and that he became the custodial parent. He said the codefendant treated his daughter and the codefendant's five-year-old daughter equally. He said neither daughter was injured while they lived with him and the codefendant. He agreed he and the codefendant argued during their relationship. He said that during one argument, he pulled back the codefendant's finger but denied the finger was broken. He denied that any other physical confrontations occurred and that the arguments involved the children. He said they argued about trivial matters, including his not wanting the codefendant to use Facebook.

The Defendant testified that his daughter required surgery after she came to live with the Defendant and the codefendant. The Defendant said that when his daughter was in the hospital for the surgery, he and the codefendant's father had an argument and were asked to leave the hospital. The codefendant stayed with the Defendant's daughter at the hospital. He agreed the codefendant was a good mother to their daughters and to the victim.

The Defendant testified relative to the June 10 incident that the codefendant took a shower and went to bed, that he told the codefendant what occurred, and that she took the victim to the pediatrician's office. Relative to the June 21 incident, he said that he told the codefendant to stay in bed and that he would feed the victim. He agreed the codefendant drank alcohol occasionally and said he had no reason to believe the codefendant drank alcohol around the children. He said that the codefendant did not use illegal drugs, that the only medications he took were prescribed, and that he took the medication as directed.

The Defendant testified that it had been years since he had cared for an infant and that the codefendant told him how to suction mucus from the victim's nose after noticing the Defendant had done it improperly. He agreed that initially he held the victim's jaw rather than the victim's forehead to suction the victim's nose and that it was possible he continued to hold the victim's jaw after the codefendant told him to hold the forehead. He agreed that

-19-

the codefendant told him that he was too rough when pulling the victim's arms and legs but denied that he continued to be too rough after the codefendant talked to him about it. He agreed that he had never seen the codefendant grab and pull the victim's legs and that the codefendant was not rough with the children.

Kimberly Ledford testified on behalf of the codefendant that Ms. Ledford's son began a romantic relationship with the codefendant when the codefendant's daughter was about nine months old and that the relationship lasted about three and one-half years. She said that her son and the codefendant lived in her home and planned to marry but that her son was killed by an intoxicated driver. She said that the codefendant was a good mother and that the codefendant took her daughter to the park, read and sang to her daughter, and took her daughter to the pediatrician's office when necessary. Ms. Ledford said the codefendant's daughter never sustained any injuries while the codefendant lived with Ms. Ledford. Ms. Ledford said that the codefendant moved out of her home before the victim was born and that she did not see the victim and the codefendant interact, although she continued to see the codefendant's daughter and the victim, who were living with the codefendant's father and stepmother at the time of the trial. She said that she visited the codefendant's daughter twice per week and that the victim talked and walked well and appeared smart. She said that the victim's nose was "caved in" slightly, that she thought the victim had minor continuing nasal congestion, and that the victim appeared to be doing well. She said the physicians continued treating the congestion.

On cross-examination, Ms. Ledford testified that her son, the codefendant, and the codefendant's daughter moved into her home in February 2010, that Ms. Ledford's son was killed in July 2010, and that the codefendant and her daughter continued living in her home until March 2011. Ms. Ledford said she visited the codefendant and the Defendant's home at least once per week to visit the codefendant's daughter. She said, though, most of her visits occurred before the victim was removed from the home.

Jacqueline Lewis, the codefendant's sister, was recalled by the codefendant and testified that she lived with her father, stepmother, the victim, and the codefendant's daughter. She said that after the victim was born, she visited the Defendant and the codefendant's home about once per week for a few hours, that she sometimes stayed overnight, and that she never saw the codefendant engage in any type of inappropriate behavior toward the victim. She said the codefendant took good care of the victim and the other children. She denied witnessing the Defendant or the codefendant abuse the victim and denied witnessing the Defendant abuse the codefendant. Ms. Lewis said that the Defendant and the codefendant both cared for the victim and the two daughters. Ms. Lewis said she had no concerns about the care the Defendant and the codefendant provided the children.

Ms. Lewis identified photographs of the victim she had taken between September 9, 2013, and September 19, 2013.[1] The photographs showed the victim at a park playing in the sandbox and on the swing and playing on a rocking horse. Ms. Lewis noted that the victim learned quickly how to turn on and off the rocking horse by pushing on the horse's ear. An additional photograph showed the victim standing in a doorway, and Ms. Lewis said the victim could stand and walk without assistance. She said that the victim did not have any health-related problems at the time of the trial.

On cross-examination, Ms. Lewis testified that she understood the long-term impact of the victim's fractures was unknown. She agreed she did not know what occurred in the Defendant and the codefendant's home when she was not present.

Kimberly Gibson, the codefendant's sister, testified she had no concerns about the codefendant's treatment of the victim and the codefendant's daughter. She thought the codefendant was a great mother, who provided and cared for her children. She recalled that on Father's Day 2012, she drove the codefendant, the victim, and the two daughters to Ms. Gibson and the codefendant's father's home. Ms. Gibson recalled that the victim was a normal baby and that she did not have any concerns. She recalled that in late June 2012, the codefendant, the victim, and the codefendant's daughter stayed overnight at Ms. Gibson's home because the Defendant and the codefendant had an argument. Ms. Gibson did not notice any bruises or marks on the codefendant, the victim, or the codefendant's daughter.

On cross-examination, Ms. Gibson testified that the codefendant returned to the family home with the Defendant after staying one night at Ms. Gibson's house. Ms. Gibson said that after a DCS caseworker came to the hospital to investigate the victim's injuries, she contacted DCS to "vouch" for the codefendant and to report that the home environment was okay and that the codefendant was a good mother. Ms. Gibson denied telling the prosecutor at a previous meeting that Ms. Gibson called DCS after the Defendant fell down the stairs to report her concerns about the home environment. She admitted, though, that she was concerned about the victim after the second fall. She said the codefendant asked her to pick her up once or twice after the victim was born because the codefendant and the Defendant had argued. When asked if the codefendant feared the Defendant, Ms. Gibson said the codefendant was angry and wanted to leave.

---

[1] We note that the trial began on September 17, 2013, and concluded on September 20, 2013.

Erica Bells testified that the codefendant and the codefendant's daughter lived with her and her husband when the codefendant's daughter was about ten months old. Ms. Bells never had any concerns about the manner in which the codefendant treated her daughter. Ms. Bells said that she had a nine-month-old child at the time of the trial and that her approach to parenting was modeled after the codefendant. She said the codefendant taught her much about being a parent. Ms. Bells said that she and her husband owned a roofing company and that her husband hired the Defendant. Ms. Bell agreed that she maintained the company's finances, that the Defendant began working around the time of the victim's birth, and that the Defendant worked for a couple of weeks. She said that she provided the codefendant transportation to the codefendant's supervised visits with the victim after the victim was removed from the Defendant and the codefendant's home.

On cross-examination, Ms. Bells testified that she visited the Defendant and the codefendant's home once or twice per week. She agreed, though, she did not know what happened after she left the home. She was unaware of the number of bone fractures the victim sustained. On redirect examination, Ms. Bells stated that she did not believe the codefendant inflicted the victim's injuries.

The codefendant testified that she first learned the details of the victim's injuries during the trial. She said she was upset with the physicians at the first hospital and at the pediatrician's office because she trusted the physicians' telling her that the victim was okay. She said the only fracture she knew about was the tibia fracture.

The codefendant testified that she and the Defendant were able to pay the bills with the Defendant's income and that although money was "tight" with three children in the home, they were not overwhelmed. She said she loved being a mother to the children. She said that other than the Defendant's falling while holding the victim, she did not know how the victim received the bone fractures. She recalled, though, that around July 1, she told the Defendant not to hold the victim's face while suctioning the victim's nostrils. She also recalled that on July 4, the Defendant's ten-month-old daughter climbed on the victim while the codefendant was in another room of the home. She also noted that the suctioning bulb slipped out of the Defendant's hand on one occasion and that the bulb cut the victim's upper lip. She said she told the detective about these incidents in response to the detective's request for information relating to "anything that had happened." The codefendant denied knowing about the extent of the victim's injuries at the time she spoke to the detective.

The codefendant testified relative to the victim's nasal congestion that the Defendant held the victim by his chin and cheek, which she thought was inappropriate. She said that she demonstrated the proper way to hold the victim when suctioning the victim's nostrils and

that afterward, the Defendant held the victim properly. She said that she knew of the Defendant's falling twice while holding the victim and that none of the physicians treating the victim told her the victim's injuries were inconsistent with the falls reported by the Defendant.

The codefendant testified that she never delayed seeking medical attention for the victim and that the Defendant did not display anger toward the children. She said the Defendant sometimes displayed anger toward her, and she admitted the Defendant broke her cell phone. She said that on one occasion, she and the Defendant argued, the Defendant attempted to leave in her car, she reached for her car key, and her finger "got jammed." She said that after July 6, she asked the Defendant if he hurt the victim and that the Defendant denied hurting the victim intentionally. She said the Defendant never denied falling while holding the victim. She said that she initially believed the Defendant but that she now believed the Defendant injured the victim.

The codefendant testified that she did not injure the victim and that she was not in the room when the Defendant fell with the victim, although she was home. She said that since the victim was born, the Defendant had worked at various employers. She said the Defendant took care of the victim, his ten-month-old daughter, and the codefendant's daughter. Relative to the July 6 incident, she said that she awoke earlier than usual because the Defendant's daughter had a follow-up doctor's appointment related to the surgery one week previously. She said she woke the daughters, fed them, and got them ready to leave before waking the victim. She said that the victim had a fever of 103.2 degrees, that she called the pediatrician, and that she scheduled an appointment for the victim after the Defendant's daughter's follow-up appointment.

The codefendant testified that on July 6, she asked the victim's pediatrician to test the victim for RSV because the Defendant's daughter had RSV when she came to live with the Defendant and codefendant. She also requested the pediatrician to determine if the victim had staph because the Defendant's daughter's surgery was related to a staph infection and because the codefendant knew staph could present with respiratory problems. She said that on July 6, she knew about the Defendant's falling twice but did not know about the victim's injuries. She was only attempting to provide the pediatrician with information.

The codefendant testified relative to July 5 that the victim was lying on the Defendant's lap, that the Defendant was holding the victim's hands, and that the Defendant was "punching himself in the face" with the victim's hands. The codefendant told the Defendant to stop because the Defendant was "doing it fast." She did not think, however, that the Defendant used force. She said that her mother babysat the three children around

-23-

June 12, while the codefendant and the Defendant went to dinner for their anniversary and that her mother babysat for three days while the Defendant's daughter underwent surgery. She said that around the time of the Defendant's daughter's surgery, the Defendant and the codefendant argued and that the codefendant, the victim, and the codefendant's daughter left the family home and went to the codefendant's sister's home. The codefendant intended to stay overnight at her sister's home but left and went to the hospital to be with the Defendant's daughter. She said she remained at the hospital for three days, and her mother cared for the victim during that time. She said her mother's boyfriend also cared for the victim periodically.

The codefendant testified that she spoke to her mother, Ms. Jarocki, about her concerns regarding the victim. The codefendant said that at the victim's two-week-old wellness visit, she discussed with the nurse practitioner that the victim was not "breathing clear enough" and was fussier than the daughters. She said the victim's formula was changed because the nurse practitioner thought the victim might have had colic. The codefendant said the nurse practitioner stated that the congestion was probably material remaining after the birth and that the codefendant should continue to suction the victim's nose until the material "pass[ed] on its own."

The codefendant testified relative to the June 10 incident that she was upstairs sleeping when the Defendant fell, that the Defendant woke her around midnight and told her what occurred, and that she examined the victim. She said that the victim "seemed fine" and not "bothered by" the fall. She said the victim was not crying. The following morning she saw a bruise on the victim's left cheek but said the bruise did not "seem to bother" the victim. She said that later the same day, she saw a spot of dried blood in the victim's left ear and that she took the victim to the emergency room. She reported the information to the medical personnel, who ordered a CT scan of the victim's head. She said the CT scan results were negative. She recalled that medical personnel asked if the Defendant had exerted force toward the victim and that she did not believe the Defendant had done anything improper. She said the victim was discharged from the hospital that evening.

The codefendant testified that on June 15, she took the victim to his one-month wellness visit and that she expressed concerns about the victim's congestion, fussiness, and lack of appetite. She said she was told that the congestion was related to a virus and that she should continue to suction the victim's nose and to use saline drops. She was told the pediatrician's office would schedule an appointment for the victim with an ear, nose, and throat doctor. She said that when she called the office about the referral, nobody returned her call.

The codefendant testified relative to the June 21 incident that the victim woke around 7:00 a.m., that she reached over to pick up the victim from his bassinet, that the Defendant told her to go back to sleep, and that the Defendant said he would feed the victim, change his diaper, and bring the victim to her when the Defendant left for work. She said that she fell asleep and that she next heard the Defendant yelling for her from the living room. She said she ran downstairs and found the Defendant and the victim on the floor. She said the victim was crying softly, almost whimpering. She thought the victim might have been in shock and saw that the victim's head was swollen. The victim had bruises behind his ears and on the right side of his forehead. The codefendant said that at the hospital, chest x-rays and a CT scan were performed and that the results were negative. She noted that nobody told her the victim's injuries were inconsistent with a fall and that the victim was released from the hospital by 12:30 p.m.

The codefendant testified that when she and the victim arrived home from the hospital, two DCS caseworkers were there. The codefendant and the Defendant spoke with one of the DCS caseworkers, who inspected the home, examined and spoke with the children, and said it appeared the codefendant was doing everything correctly. The codefendant said that the DCS caseworker asked her to call him with information related to the victim's follow-up appointments. The codefendant said she requested Ms. Jarocki come to the home to examine the victim because the codefendant was concerned, although the hospital staff said the victim was fine. Ms. Jarocki examined the victim and also thought the victim was fine. The codefendant said that the Defendant was home when she and the victim arrived from the hospital and that the Defendant asked about the victim's condition. After the codefendant explained what the physicians told her about the victim's condition, the Defendant went upstairs to sleep. She recalled the Defendant's complaining his back hurt and said the Defendant had a "swollen knot" on his left lower back and a scratch on his leg.

The codefendant testified that on the night of June 21, she and the Defendant were sitting on the sofa with the victim. She said that the Defendant noticed the victim's leg was swollen and that they decided to call the emergency room physician who treated the victim. The codefendant said that based upon her conversation with the physician, she took the victim to the pediatrician's office to the previously scheduled follow-up appointment on June 22. The codefendant said she told Dr. Fernando about the victim's swollen leg and discussed the victim's continued issues with congestion and eating habits. She said an x-ray taken at the hospital on June 22 showed a tibia fracture. She said that nobody suggested the victim's injuries were caused by abuse. The codefendant took the victim to Dr. Voytik's office on June 26. The codefendant said that after discussing the x-rays with Dr. Voytik, the codefendant did not believe the victim's leg was fractured.

The codefendant testified that her statement at the children's hospital that she never allowed the victim out of her sight was not meant literally. She said that although she left the victim's presence to take showers, to sleep, to use the restroom, and to purchase groceries, she did not think the victim was away from her long enough for the injuries to have occurred. She said that she initially did not think the Defendant harmed the victim and that she would never have allowed the Defendant to be around the victim or her daughter had she thought the Defendant had harmed the victim.

The codefendant testified that the Defendant's pain medication was prescribed for back pain, that she never saw the Defendant take the medication, and that the Defendant never appeared intoxicated. She never questioned the Defendant's ability to do anything properly. She never saw the Defendant act in a manner that would have caused her to believe the Defendant would hurt any of the children intentionally or unintentionally.

On cross-examination, the codefendant testified that she met the Defendant in June 2011 and that they were living together by August or September 2011. Relative to the Defendant's work schedule, she said that the Defendant worked for various people, that he worked when it was available, that his schedule varied, that he worked eight to twelve hours per day, and that he occasionally worked on the weekend. Relative to the children, she said the Defendant helped "quite a bit." Relative to the argument she and the Defendant had in which she left the family home, she agreed she left the Defendant's daughter behind with the Defendant. She said she felt comfortable leaving the Defendant's daughter with him.

The codefendant testified that she and the Defendant received the rug from Ms. Ledford shortly before the June 10 incident. The codefendant agreed the edges of the rug were curled upward and said the rug had been removed from the home before she came downstairs. She agreed that the Defendant told her what occurred when he woke her and that she examined the victim immediately. Relative to the June 21 incident, she agreed the Defendant screamed her name and that the Defendant did not attempt to conceal what had occurred.

The codefendant testified that she never saw the Defendant do anything that caused her to suspect he caused the victim's injuries. Relative to the Defendant's suctioning the victim's nostrils, she said that she did not believe the Defendant was intentionally attempting to hold the victim's jaw and that the Defendant was only attempting to hold the victim still. She agreed that the Defendant could not "master that technique" and that it seemed "little bit above" the Defendant. Relative to the photograph showing the Defendant holding the victim with one hand away from the Defendant's body, the codefendant said she thought she was

home when the photograph was taken but could not recall if she was in the room. She said the Defendant did not have a habit of "holding his child like a pizza."

The codefendant testified that on July 4, the Defendant's daughter and the victim were in the living room, that the codefendant left the room, that the codefendant returned, and that the Defendant's ten-month-old daughter was on the victim. The codefendant said that as she picked up the Defendant's daughter, the Defendant's daughter held onto and pulled the victim's ear. She said the victim was lying in a rocker that was sitting on the floor. She thought the Defendant was in the kitchen but was unsure. She said that to her knowledge, the Defendant never hit or kicked the victim. She said that when she told the Defendant to stop "play boxing" with the victim, the Defendant stopped.

The codefendant testified that the Defendant always wore his socks pulled out and tucked under his feet. She agreed wearing socks in that manner was hazardous, especially when walking up stairs. She never believed the Defendant "staged" the victim or himself on June 21. She said that although she had plenty of time to think about how the victim was injured, she could only recall the Defendant's falling twice while holding the victim as the causes. Relative to the Defendant's pain medication, she said she did not know the quantity the Defendant took.

The codefendant testified that based upon the medical evidence presented at the trial and the timeline of the injuries, she believed the Defendant was responsible for the victim's injuries. She denied harming the victim and said no other explanation existed for the injuries. She denied noticing signs that the victim was being abused. Relative to the June 10 incident, she said the Defendant lied when he testified that the Defendant did not wake her. She said the Defendant woke her after falling while holding the victim. She said, "I heard him testify yesterday to quite a few things that were not the truth." Relative to the June 21, incident, she said the Defendant's testimony that the victim was screaming when the codefendant came downstairs was false and that the victim was only whimpering. She agreed that although she was home at the time of the June 10 and 21 falls, she was not present and did not know what occurred.

The codefendant testified that she did not shake the victim because she was frustrated with the victim's fussiness and having three children in the home. She agreed that the medical testimony showed the victim's injuries could not have been caused by the Defendant's ten-month-old daughter and said that she only provided the police with information about the incident involving the Defendant's daughter because she was asked to list any incident she thought might have caused the victim's injuries. She denied blaming the Defendant's daughter for the victim's injuries.

The codefendant testified that the Defendant worked "a few days" per week and that he was home if he was not at work. She said she might have left the children with the Defendant for a few hours to run errands and to purchase groceries, but she denied leaving the victim with the Defendant for an entire day. She said that although she knew the victim was uncomfortable because of his fussiness, she did not know the victim was in pain.

Upon this evidence, the Defendant was convicted of aggravated child abuse. The codefendant was acquitted of all charges. This appeal followed.

As a preliminary matter, the State contends that the Defendant filed an untimely motion for a new trial and that as a result, the Defendant's notice of appeal was untimely. The State requests this court to dismiss the appeal because of the untimely notice of appeal, and alternatively, to waive the Defendant's issue related to his request for a mistrial because of the untimely motion for a new trial. In his reply brief, the Defendant concedes the motion for a new trial was untimely and requests this court to consider his appeal in the interest of justice.

Tennessee Criminal Procedure Rule 33(b) states, "A motion for a new trial shall be in writing . . . within thirty days of the date the order of sentence is entered." The thirty-day requirement is mandatory and jurisdictional and cannot be waived. *State v. Martin*, 940 S.W.3d 567, 569 (Tenn. Crim. App. 1997); *see* Tenn. R. Crim. P. 45(b)(3) (stating, in relevant part, that a trial court may not extend the time for taking any action pursuant to Criminal Procedure Rule 33). This court "does not have the authority to waive the untimely filing of a motion for new trial." *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997); *see* T.R.A.P. 4(a). "A motion for a new trial which is not timely filed is a nullity." *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). As a result, a trial court has no jurisdiction to hold a hearing or render a ruling on an untimely motion for a new trial. *See State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997).

The record reflects that the sentencing hearing was held and the judgment form was filed on February 10, 2014. Although the motion for a new trial does not reflect a trial court stamp-filed date, the certificate of service reflects that the motion was submitted on March 20, 2014. The Defendant's motion for a new trial was untimely, and he has waived his right to appeal any issues contained in the motion, except sufficiency of the evidence and sentencing. *See Patterson*, 966 S.W.2d at 440 (citing *State v. Givhan*, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980)); *see also State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987) (limiting appellate review to issues that would result in a dismissal when a motion for a new trial is untimely).

The record also reflects that the trial court's order denying the Defendant's motion for a new trial was entered on September 9, 2014, and that the notice of appeal was filed on September 22, 2014. Although the notice of appeal was filed within thirty days of the order denying the motion for a new trial, the untimely motion for a new trial does "not toll or defer the thirty-day period for filing the notice of appeal." *Davis*, 748 S.W.2d at 207; *see* T.R.A.P. 4(a), (c). As a result, the notice of appeal was untimely. However, the timely filing of a notice of appeal is not jurisdictional, and this court is permitted to waive the timely filing in the interest of justice. T.R.A.P. 4(a). Although this court lacks jurisdiction to consider the Defendant's issue relative to the motion for a mistrial, we will consider the sufficiency of the evidence and the sentence imposed by the trial court in the interest of justice.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. He argues that the State failed to prove that he inflicted any injury by non-accidental means, that he knowingly caused serious bodily injury, and that he exercised exclusive control over the victim, excluding the possibility that other people inflicted the victim's non-accidental injuries. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In relevant part, "[a] person commits the offense of aggravated child abuse . . . who commits the offense of child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). Generally, the offense is a Class B felony, but the offense is a Class A felony if the abused child is eight years of age or less. *Id*. § 39-15-402(b). A person commits a form of child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a) (2014). A person acts "knowingly"

> with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-106(a)(20) (Supp. 2011) (amended 2014); *see id.* § 39-11-302(b) (2014). The Criminal Code provides serious bodily injury includes "[a] broken bone of a child who is eight (8) years of age or less." *Id.* § 39-11-106(a)(34)(F). Relative to aggravated child abuse, serious bodily injury against a child includes "a fracture of any bone[.]" *Id.* § 39-15-402(d).

In the light most favorable to the State, the record reflects that the victim, who was less than two months old during the relevant time frame, sustained at least fifteen bone fractures. Relative to the Defendant's argument that the State failed to establish that he exercised exclusive control over the victim, excluding the possibility that others inflicted the victim's non-accidental injuries, the jury's verdicts reflect that it credited the codefendant's testimony that she did not harm the victim. The other individuals who had access to the victim during the time in which the victim sustained the multiple bone fractures were Ms. Jarocki, Ms. Lewis, Ms. Gibson, Ms. Bells and the Defendant. Relative to Ms. Jarocki, Ms. Lewis, Ms. Gibson, and Ms. Bells, the jury's verdict reflects that it credited each witnesses' testimony and found that none of them inflicted the victim's injuries. Relative to the Defendant, though, the verdict reflects that the jurors discredited the Defendant's testimony that he only inflicted accidental trauma as the result of his falling while holding the victim on June 10 and 21. Questions regarding witness credibility and conflicts in the evidence were resolved by the jury. *Bland*, 958 S.W.2d at 659; *see Sheffield*, 676 S.W.2d at 547. We note that the victim's bone fractures were sustained between June 5 and July 6 based upon when the fractures were visible on the x-rays and the various rates of healing and that the record reflects that Ms. Jarocki, Ms. Lewis, Ms. Gibson, or Ms. Bells's access to the victim was limited during the relevant period. Although the codefendant was the victim's primary caretaker, the Defendant cared for the victim when he was home and not working. Although none of the prosecution's witnesses saw the Defendant inflict the victim's non-accidental

injuries, the codefendant testified that the Defendant was alone with the victim when the codefendant shopped for groceries, slept, used the restroom, and showered. Dr. Garcia testified that the fractures would have been inflicted within seconds. As a result, we conclude that the jury could have reasonably found that the Defendant exercised exclusive control over the victim in which to inflict the victim's bone fractures.

Relative to the Defendant's argument that the State failed to prove that he inflicted any bone fracture by non-accidental means and that he knowingly caused serious bodily injury, the record reflects that Dr. Sammer concluded that the victim's fractures were consistent with shaking and blunt force trauma. Genetic disorders, metabolic disorders, and organic diseases were excluded as causes for the fractures. Dr. Garcia stated that corner fractures did not result from casual bouncing, shaking, jostling, and tossing a child in the air and that corner fractures were the result of non-accidental trauma and physical abuse. Dr. Garcia concluded that, based upon the various fractures and healing rates, four events occurred between June 5 and July 10 and that the victim sustained seven corner fractures. Assuming the jury credited the Defendant's testimony that he fell twice while holding the victim, two events remained unexplained. Although Dr. Garcia testified that the bruise on the victim's face was consistent with the June 10 fall as reported by the Defendant, the fractured mandible was sustained before June 10 based upon the healing fracture visible on the June 10 x-ray. Dr. Garcia conceded the skull fracture was consistent with the June 21 fall as reported by the Defendant, but she stated that rib corner fractures as sustained by the victim were consistent with a shaking-type motion. Dr. Garcia concluded that the victim sustained the fractures as a result of non-accidental trauma and was physically abused. As we have stated, a bone fracture sustained by a child who is age eight or less is defined by our statutes as serious bodily injury. *See* T.C.A. § 39-11-106(a)(34)(F); *id.* § 39-15-402(d). We conclude that the jury could have found beyond a reasonable doubt that the Defendant inflicted the victim's injuries by non-accidental means and that the Defendant knowingly caused serious bodily injury. Likewise, we conclude that sufficient evidence exists to support the conviction and that the Defendant is not entitled to relief on this basis.

## II

### Motion for a Mistrial

The Defendant contends that the trial court erred by denying his request for a mistrial after Detective Wattenbarger testified that Ms. Jarocki offered to undergo a polygraph examination in an effort to exclude her as the person who inflicted the victim's injuries. As previously stated, the Defendant's untimely motion for a new trial deprives this court of the jurisdiction to review the issue. The Defendant is not entitled to relief on this basis.

# III

## Sentencing

The Defendant contends that his sentence is excessive. He argues that the trial court erroneously applied enhancement factors and failed to apply a mitigating factor. *See* T.C.A. §§ 40-35-113 (2014), 40-35-114 (2014). The Defendant requests a fifteen-year sentence. The State responds that the trial court properly applied enhancement and mitigating factors and that that the Defendant's sentence is reasonable.

As a preliminary matter, we note that the Defendant erroneously cites to the de novo standard of review of sentencing determinations. Our supreme court delineated the current review standard involving questions related to the length of a sentence in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012), three years previously. This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *Bise*, 380 S.W.3d at 708. A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

At the sentencing hearing, the presentence report was received as an exhibit. The report reflects that the Defendant had a previous conviction for driving with a revoked license. The Defendant was previously charged with drag racing and domestic assault, both of which were dismissed. Although the domestic assault charge was dismissed upon

payment of court costs and fines, the Defendant was placed on probation pending full payment and violated his probation for nonpayment and failure to report to his probation officer. More than one year later, the Defendant's probation was revoked again, and he was ordered to serve thirty days in confinement. The Defendant completed the tenth grade but did not graduate from high school. The Defendant reported good mental and physical health, although he suffered from scoliosis and had developed diabetes before the trial. The Defendant reported he first drank alcohol at age eighteen, drank socially, always remained sober while drinking, and stopped drinking by the end of 2010. The Defendant reported smoking marijuana between ages sixteen and twenty-two and said he stopped using drugs for employment-related reasons.

Victim impact statements were included in the presentence report. Teresa Lewis, the victim's maternal grandmother and legal guardian, discussed her becoming a parent to the codefendant's daughter and to the victim. She said the victim required future nose surgery and possibly eye surgery. She noted that the codefendant's daughter suffered emotional injury as a result of her family being "ripped" from her. Ms. Lewis said the codefendant's daughter had been in counseling because of the stress and noted the codefendant's daughter "cried, . . . wet the bed and had nightmares." Ms. Lewis requested the Defendant receive the maximum sentence and never be permitted to have contact with the children.

Gary Lewis, the victim's paternal grandfather and legal guardian, discussed the victim's living with him and Ms. Lewis. He said that although the victim was strong and intelligent, the victim's physicians did not know the long term effects of the victim's injuries. Although Mr. Lewis had no opinion about the length of the Defendant's sentence, Mr. Lewis wanted the Defendant's parental rights terminated.

Probation and Parole Officer Judith Hilton-Coffman prepared the Defendant's presentence report. She provided testimony consistent with the presentence report she prepared relative to the Defendant's criminal history, education, mental and physical health, and medical history. She said the Defendant did not mention taking pain medication at the time of the offense. Ms. Hilton-Coffman did not speak to the Defendant's family. She said the Defendant's employment history was sporadic, noting the Defendant's working for Sys-Tech, Progressive Logistics, and a plumbing company.

Ms. Hilton-Coffman testified that although the Defendant did not submit a statement, he mentioned to her that he did not know how the victim sustained the bone fractures. Relative to the victim impact statements, Ms. Hilton-Coffman said the long term effects of the victim's injuries were still unknown. She noted the victim would most likely require surgery in the future. She said that her primary duty was to prepare presentence reports and

that she had never seen a child abuse case in which an infant victim had been subjected to such violence.

Mary Lou Allen, the Defendant's mother, testified for the defense that the Defendant was born in Texas and that he moved to Tennessee to live with her when he was age twelve or thirteen. She said the Defendant was a good child and helped around the house when he was a teenager. She noted the Defendant worked for people in the neighborhood performing odd jobs as a teenager. She said the Defendant had always had a good work ethic.

Ms. Allen testified that the Defendant had three children and that she had never seen the Defendant abuse any of his children. She said relative to the Defendant's daughter who was ten months old at the time of the incidents, the Defendant sought custody of his daughter because of the mother's drug addiction. The mother of the Defendant's oldest child moved to Chicago with the son shortly after the birth. She said that the Defendant, the codefendant, and their respective daughters lived with Ms. Allen for two or three months in October 2011 or 2012. Ms. Allen said the Defendant helped take care of the children when he was not at work. She said that the Defendant worked regularly, unless he was laid off, and that the Defendant took an active role in his children's lives. She denied that the Defendant abused or neglected his children.

Ms. Allen testified that after the victim was released from the hospital on the day the Defendant fell while holding the victim, she spoke to the Defendant, who asked her to go to his and the codefendant's home to check on the victim. Ms. Allen said the victim looked fine to her, although the codefendant asked her to look at the victim's head. The codefendant mentioned the victim's head was swollen. Upon further examination, Ms. Allen saw that the victim's head was swollen and asked why the hospital allowed the victim to go home. While at the home, Ms. Allen saw the codefendant's five-year-old daughter doing cartwheels and said the victim was almost kicked in the head. She denied she blamed the daughter for the victim's injuries.

On cross-examination, Ms. Allen testified that she had no knowledge of the Defendant and the codefendant's fighting at the hospital when the victim was born. She identified the photograph of the Defendant holding the victim with one hand away from the Defendant's body and said that the manner in which the Defendant held the victim was not inappropriate when done properly. She noted the Defendant was proud of having a son. She denied she blamed the codefendant and the daughters for the victim's injuries and said she knew her son did not cause the victim's injuries.

Ms. Allen testified relative to the Defendant's domestic violence charge that the mother of the Defendant's daughter "started the whole thing" and that witnesses saw the Defendant was innocent. She noted the daughter's mother was charged with domestic violence against the Defendant.

The trial court stated that in determining the Defendant's sentence it had reviewed the sentencing guidelines, considered the evidence and exhibits presented at the trial, and considered the proof at the sentencing hearing. Relative to mitigating factors, the trial court found that none of the factors applied. Although the Defendant requested the court apply factor (6), the court refused. *See id*. § 40-35-113(6) ("The defendant, because of youth . . . , lacked substantial judgment in committing the offense[.]"). The court noted that the Defendant "did it over and over, and over and over, and over and over, and over and over, and over and over again."

Relative to enhancement factors, the court found that factor (1) applied because the Defendant had a "history of convictions," although the Defendant had no previous felony convictions. *See* T.C.A. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court noted it did not place much weight on this factor because the Defendant "barely ha[d] a criminal record." The court found that factor (3) applied because the evidence showed more than one victim. *See id.* § 40-35-113(3) ("The offense involved more than one (1) victim[.]"). The court noted the presentence report showed "proof of psychological and emotional injury" to the codefendant's daughter. The court found that the daughter had been receiving counseling, had nightmares, had wet the bed, and had cried because her family "was ripped apart by this act." The trial judge stated that "I do weigh that factor of enhancement in this matter." The court found that factor (14) applied because the photograph of the Defendant holding the victim with one hand away from the Defendant's body showed a "picture of vulnerability . . . [and] a picture of trust." *See id*. § 40-35-114 (14) ("The defendant abused a position of . . . private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense[.]"). The court weighed heavily upon this factor. The court refused to apply factors (4), (5), (10), and (12). *See id.* § 40-35-113(4) ("The victim of the offense was particularly vulnerable because of age or physical or mental disability[.]"); -113(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense[.]"); -113(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high[.]"); -113(12) ("During the commission of the felony, the defendant intentionally inflicted serious bodily injury upon . . . a victim[.]"). The court sentenced the Defendant to twenty-three years' confinement.

Relative to enhancement factor (1) regarding previous criminal convictions and behavior, the Defendant states in his brief that he had only one prior conviction for driving with a revoked license, which is supported by the record. Although he notes that the State did not request application of this factor, he fails to state how the trial court abused its discretion by applying this factor and fails to cite to any legal authority reflecting application of this factor in the present case was erroneous. In any event, application of factor (1) is appropriate. Although a misdemeanor, the Defendant was previously convicted of a criminal offense. Likewise, the Defendant admitted during the presentence investigation that he had smoked marijuana. The Defendant's criminal conviction and criminal conduct reflect a previous history of "criminal convictions or criminal behavior." We note that the trial court placed little weight on this factor because the court found that the Defendant "barely ha[d] a criminal record." Application of this factor was not improper.

Relative to enhancement factor (3) regarding more than one victim, the Defendant argues that no allegation was made during any of the proceedings that more than one victim existed and that the trial court should not have considered the codefendant's five-year-old daughter as a victim for sentencing purposes. Again, he does not cite to any legal authority showing application of this factor was erroneous. In any event, the record reflects that the trial court applied this factor because of the "psychological and emotional injury" to the codefendant's daughter based on the information provided in the victim impact statement. In *State v. Imfeld*, 70 S.W.3d 698 (Tenn. 2002), our supreme court addressed the application of enhancement factor (3) in the context of aggravated assault. The court noted that convictions for aggravated assault were obtained based upon a named victim and that the "statutory language of the 'multiple victims' factor . . . limits its application to 'an *offense*' involving more than one (1) victim." *Id*. at 705-706. (emphasis in original). The court concluded that "there cannot be multiple victims for any one offense of aggravated assault committed against a specific, named victim." *Id*. at 706. In contrast, our supreme court concluded that factor (3) was applicable to aggravated arson convictions because the offense does "not permit multiple convictions in spite of the fact that multiple persons" might be victimized by a fire. *State v. Lewis*, 44 S.W.3d 501, 508 (Tenn. 2001).

In *State v. Gabriel Cordova Delarosa*, No. E2008-01940-CCA-R3-CD, 2010 WL 454806, at *5 (Tenn. Crim. App. Feb. 10, 2010), this court reached a similar conclusion to *Imfeld* in the context of vehicular homicide. This court concluded that application of factor (3) was improper for a vehicular homicide conviction because the offense had a specific, named victim and that factor (3) "cannot apply . . . where the charge is necessarily limited to a specific, named victim." *Id*. (citing *Imfeld*, 70 SW.3d at 705-06). Likewise, in *State v. Mark Allen Haskett*, No. E2001-00600-CCA-R3-CD, 2002 WL 31431498, at *10 (Tenn. Crim. App. Oct. 31, 2002), the trial court applied factor (3) to enhance a sentence for assault

on the basis that the Defendant's four-year-old daughter was present when the Defendant assaulted his former wife. Relying on *Imfeld*, this court concluded that application of factor (3) was improper because "there cannot be multiple victims for an offense committed against a specific, named victim." *Id*. (citing *Imfeld*, 70 S.W.3d at 705-706).

In the present case, the Defendant was convicted of aggravated child abuse of a child eight years of age or less. *See* T.C.A. § 39-15-402; 39-15-401(a). The offense requires a named victim because the State must prove beyond a reasonable doubt that a defendant knowingly treated a child, other than by accidental means, in such a manner as to inflict injury. *Id*. § 39-15-401(a). Likewise, the State is required to prove beyond a reasonable doubt that the abuse resulted in "serious bodily injury to *the child*." *Id*. § 39-15-402(a)(1) (emphasis added). We note the indictment contained one count of aggravated child abuse against the infant victim. The codefendant's daughter was not identified as a victim in the indictment. As a result, we conclude that the trial court's application of factor (3) was improper.

Relative to enhancement factor (14) regarding a position of trust, the Defendant argues that the trial court's reliance on the photograph showing the Defendant holding the victim with one hand away from the Defendant's body to find the Defendant abused a position of trust was erroneous. He argues, rather, that the photograph shows "a loving relationship between father and son." The trial court's comments regarding the photograph do not reflect that it found a depiction of abuse in the photograph. The court's statement reflects that an infant only a few weeks old was vulnerable and at the mercy of his parents to provide life necessities. The Defendant was the victim's father, and as a result, held a position of private trust. The Defendant was alone with the victim because he was the victim's father, and the Defendant's position of trust facilitated the commission of the offense. The court's application of factor (14) was proper.

Relative to mitigating factor (6) regarding the Defendant's lacking substantial judgment, the Defendant argues that the trial court erred by refusing to find the factor applicable. Likewise, he argues that the court's stating that he "did it over and over, and over and over, and over and over, and over and over, and over and over again," was a mischaracterization of the evidence because he was only indicted for one count of aggravated child abuse and because the evidence did not establish multiple incidents of abuse. Although the Defendant correctly notes that he was only indicted for one count of aggravated child abuse, the expert testimony at the trial established that multiple events occurred, resulting in the victim's fifteen or sixteen bone fractures. The varying rates of healing bone fractures and the varying amount of callus found in the victim's x-rays taken at differing times supports a finding that the Defendant engaged in a pattern of abusive conduct on at least four occasions

that caused the victim's injuries. We note that although some of the victim's injuries were consistent with the Defendant's reported falls, some of the victim's injuries were sustained before and after those incidents and were inconsistent with falling and consistent with non-accidental trauma. The trial court did not abuse its discretion by refusing to apply factor (6).

Although we have concluded that the trial court improperly applied enhancement factor (3), the Defendant is not entitled automatically to relief. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.* The Defendant received a within-range sentence for a Class A felony, and the record reflects that the trial court complied with the purposes and principles of sentencing. The court properly applied two enhancement factors and weighed heavily upon factor (14) in determining the Defendant's sentence. We note that the victim's injuries consisted of fifteen or sixteen bone fractures that were inflicted during at least four incidents between June 5 and July 6. The trial court did not abuse its discretion by imposing a twenty-three-year sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE